# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM FIGURED,** | : | |
| | : | **CIVIL ACTION NO. 3:15-1340** |
| Plaintiff | : | |
| | : | **(JUDGE MANNION)** |
| v. | : | |
| | : | |
| **CARRIZO (MARCELLUS), LLC,** | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM

Pending before the court is the defendant's motion for summary judgment with respect to the plaintiff's negligence claim against it. (Doc. 25). Based upon the court's review of the motion and related materials, the defendant's motion will be **GRANTED**.

## I. BACKGROUND

The following are the undisputed facts material to resolving the defendant's motion for summary judgment.[1] At the time of the alleged incident, the plaintiff, William Figured, worked as a "water hauler" for Holcombe Energy

---

[1] The relevant facts are taken from the pleadings, (Doc. 1; Doc. 8), the defendant's statement of material facts, (Doc. 26), the plaintiff's statement of material facts, (Doc. 30), and both parties' corresponding evidentiary exhibits. Any facts that remain in dispute are noted as such.

Resources, LLC ("Holcombe"). (Doc. 26-2). Figured's occupation involved delivering water via truck to and from oil and natural gas drilling sites for the purpose of assisting various companies with their fracking operations. (*Id.*). One of those companies was the defendant, Carrizo (Marcellus), LLC ("Carrizo"), which owned the "Shaskas Well Pad" premises where the incident occurred. (Doc. 1). Carrizo originally contracted with Rural Wastewater Management, Inc. ("Rural") to have Rural remove and transport water from its natural gas wells and into storage tanks; Rural, in turn, enlisted Holcombe as a subcontractor for the same purpose. (Doc. 26). It is undisputed that Figured was working in the course and scope of his employment with Holcombe at the time when the incident occurred. (*Id.*).

Figured testified that he had visited the Shaskas Well Pad for work-related purposes at least thirty times prior to the incident. (Doc. 26-2). The entrance to the site was ordinarily chained shut with a padlock. (*Id.*). Figured testified further that wide variations existed in the applicable safety and work protocols at the Shaskas Well Pad. (*Id.*). For instance, there was no uniformity to the manner in which water haulers were instructed to load and unload their water, the permissibility of using Carrizo-owned equipment to assist with the loading or unloading processes, or even the presence and availability of Carrizo employees on-site. (*Id.*).

On the evening of December 29, 2013, Figured was in the process of completing a work assignment to deliver water to a holding tank at the Shaskas Well Pad. (*Id.*). It had recently snowed there, and no Carrizo employees were on-site at the time. (*Id.*). Specifically, Figured's job was to unload water from his truck and into one of several holding tanks by connecting a hose to either side and operating certain release valves. (*Id.*). The ground surrounding each of these on-site holding tanks formed a "containment area" consisting of tarps and barriers intended to catch and contain any dirty water that happened to spill out from the hose during the water transfer process or from over the top of the tanks themselves. (*Id.*). One of those containment areas was filled up with standing water to a level that exceeded the top of Figured's boots. (*Id.*). The hose was lying partially submerged inside the flooded containment area, so Figured had to step one foot into the pooled water to be able to pick up and attach the hose. (*Id.*).

Next, Figured climbed up onto a ladder to ascertain whether the holding tanks had enough room inside them to proceed with pumping water into them. (*Id.*). This was a necessary maneuver for Figured to be able to complete his job. (*Id.*). Upon descending and dismounting from the ladder, however, Figured stepped backwards with his wet left foot onto the barrier that separates the containment area from the surrounding ground. (*Id.*). As he

attempted to move his right foot from the ladder and back onto the barrier as well, his left foot slipped off the barrier and jammed into the ground, causing him to sustain injuries to his foot. (*Id.*).

Figured filed the instant action against Carrizo, alleging that Carrizo negligently maintained the premises at the Shaskas Well Pad and caused Figured's injuries. (Doc. 1). Carrizo disputes this, arguing that it is exempt from liability due to Figured's status as an employee of an independent contractor. (Doc. 8). After the parties engaged in fact discovery, Carrizo moved for summary judgment. (Doc. 25). This matter has been fully briefed and is now ripe for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party, and it is "material" if proof of its existence or nonexistence would affect the outcome of the trial under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-57 (1986); *Gray v. York Newspapers, Inc.*, 957

F.2d 1070, 1078 (3d Cir. 1992). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

To determine whether a genuine dispute of material fact exists, the court should consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). In doing so, the court must view all the evidence and any inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). However, the court's function at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. *See also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (noting that the court may neither weigh the evidence nor make credibility determinations).

Parties seeking to establish that a fact is or is not genuinely disputed may not rely on unsubstantiated allegations; rather, they must support such

assertions by "citing to particular parts of materials in the record" to demonstrate that the adverse party's factual assertion either lacks support from cited materials or is unsupported by admissible evidence. Fed. R. Civ. P. 56(c)(1). *See also Celotex Corp.*, 477 U.S. at 324 (requiring evidentiary support for factual assertions made during summary judgment). A party's failure to properly support or contest an assertion of fact may result in that fact being considered undisputed for purposes of the summary judgment motion, although the court may also grant parties an opportunity to properly provide support for an asserted fact. Fed. R. Civ. P. 56(e).

To prevail on a motion for summary judgment, the moving party must affirmatively identify those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323-24. The moving party can satisfy this burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). *See also id.* at 325.

If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to avoid summary judgment. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith*

*Radio*, 475 U.S. 574, 586 (1986)). Rather, the non-moving party must provide "sufficient evidence" for a jury to return a verdict in its favor. *Id.* "[I]f the [non-movant's] evidence is merely colorable or not significantly probative, summary judgment should be granted." *Id.* (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

### III. DISCUSSION

The primary argument of the defendant, Carrizo, in favor of summary judgment on the issue of liability is that the plaintiff, Figured, was employed by a subcontractor of an independent contractor. (Doc. 27). In Pennsylvania, one "who hires an independent contractor is generally exempt from liability for injuries sustained by employees of the contractor or its subcontractor." *Beil v. Telesis Const., Inc.*, 608 Pa. 273, 279 (2011). Any "[r]esponsibility for protection [or] liability for negligence, therefore, [is] placed on the contractor and its employees." *Id.*

It is undisputed that Carrizo contracted with Rural, which in turn subcontracted with Holcombe, Figured's employer, to perform the task of hauling contaminated water to and from fracking sites. (Doc. 26-3). Rural's signed agreement with Carrizo also specifies that it will be treated as an

independent contractor. (*Id.*). Pennsylvania law, however, recognizes two main exceptions to the general rule against liability for the injuries of independent contractors. The outcome of the instant action thus hinges on the applicability of these exceptions.

### A. The Retained Control Exception

The first exception, known as the "retained control" exception, involves an inquiry into which party ultimately retained control over the manner of the contractual performance at issue. *See, e.g.*, *Silveus v. Grossman*, 307 Pa. 272, 281 (1932). "Responsibility goes with authority." *Nertavich v. PPL Elec. Utils.*, 100 A.3d 221, 227 (Pa. Super. Ct. 2014) (quoting *Beil*, 608 Pa. at 289), *aff'd*, 124 A.3d 734 (Pa. 2015). For this exception to apply, "the right of control must go beyond a general right . . . to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations [that] need not necessarily be followed, or to prescribe alterations and deviations [to the contracted-for work]." *Beil*, 608 Pa. at 290 (quoting Restatement (Second) of Torts §414 cmt. c (Am. Law. Inst. 1975)). Rather, "there must be such a retention of the right of supervision that it renders the contractor not entirely free to do the work in his own way." *Id.*

The Supreme Court of Pennsylvania has explained that a plaintiff can prove the requisite degree of control that is necessary to implicate this

exception in one of two ways: by pointing to contractual provisions that grant "control over the manner, method, and operative details of the work" to the owner of the premises, or by "demonstrat[ing] that the land owner exercised actual control over the work." *Id.* at 291. "[T]he question of the quantum of retained control necessary to make the owner of the premises liable is [ordinarily] a question for the jury, [but when] the evidence fails to establish the requisite retained control, the determination of liability may be made as a matter of law." *Id.* Finally, Pennsylvania "case law has construed this exception narrowly." *Id.* (citing *Warnick v. Home Depot U.S.A., Inc.*, 516 F. Supp. 2d 459, 468 (E.D. Pa. 2007)).

Since Figured has not alleged or argued that Carrizo retained any contractual control over the manner of performance, Figured must rely on the second portion of the test set forth in *Beil*, which asks whether the defendant exercised actual control over the work. *Beil*, 608 Pa. at 291. The evidence of record here establishes that Carrizo was relatively hands-off in its dealings with Figured and other employees at Holcombe. (Doc. 26-2). Figured testified that he generally enjoyed wide latitude to accomplish his work objectives in the manner that he and his employer saw fit. (*Id.*). Often, Carrizo employees were not even present on-site to observe how their contractors and subcontractors completed their work. (*Id.*). According to Figured, there was

little uniformity as to Carrizo's preferred protocols and procedures, and any such preferences were seldom communicated to him.[2] (*Id.*). Carrizo never trained Figured on proper water hauling technique, and all of Figured's formal and informal training in this area was attained through prior employment. (*Id.*).

Figured argues that Carrizo's preference for water haulers to complete their on-site tasks within fifteen minutes amounts to a retention of control, but timing standards of this nature do not rise to the necessary level of retained control established through analogous cases. (Doc. 31). A "long line of Pennsylvania cases has . . . almost always [found] that the hiring party did not exercise sufficient control over the contractor to impose liability on the hiring party for the contractor's employee's injury." *Warnick*, 516 F. Supp. 2d at 468. For example, in *Farabaugh v. Pa. Tpk. Comm'n*, 590 Pa. 46, 65 (2006), the court found the retained control exception inapplicable, even though the landowner required the contractor's employees to watch a safety video,

---

[2] Specifically, Figured testified that "[o]ne day, you would get there, and the chain [to lock the entrance gate] would be up . . . Other nights, you would pull in there, and the chain would be down. There would be no lights on or anything in the place. It would just be black . . . Sometimes, there was no one to check in. We'd have to unlock the gate ourselves. We'd have to make our own report. We'd put our report in the doghouse . . . and . . . chain the lock up on our way out. You'd never see a company man or another individual the whole time we were there." (Doc. 26-2).

included safety provisions in its contract, and hired a separate contractor to ensure compliance with contractual provisions. Similarly, in *Nertavich*, 100 A.3d at 224, the court found the retained control exception inapplicable, even though the defendant gave the plaintiff's employer detailed specifications on which type of paint to use for a painting job and hired an on-site representative to oversee work procedures, schedules, materials, and safety. Here, the far more attenuated connection between Figured and Carrizo exemplifies the very essence of an independent contractor relationship, where the hiring party specifies the end to be achieved and the hired party chooses the means by which to accomplish that end. Carrizo did not retain sufficient control over Figured's work performance to trigger the retained control exception, and Figured cannot impose liability for his injuries onto Carrizo on this basis.

**B. The Peculiar Risk Exception**

The second potentially applicable exception to the general rule against employers' liability for independent contractors' injuries has been termed the "peculiar risk doctrine" and is sometimes called the "special danger doctrine." *See, e.g.*, *Farabaugh*, 590 Pa. at 65. Carrizo argues that this exception for

peculiar risks does not apply to the facts of this case.[3] (Doc. 27). Pennsylvania courts have developed a two-part test for determining whether this exception applies: "(1) whether the risk is foreseeable to the owner at the time the contract is executed, [meaning] would a reasonable person foresee the risk and recognize the need to take special measures; and (2) whether the risk is different from the usual and ordinary risk[s] associated with the general type of work done." *Emery v. Leavesly McCollum*, 725 A.2d 807, 814 (Pa. Super. Ct. 1999) (citing *Edwards v. Franklin & Marshall College*, 663 A.2d 187, 190 (Pa. Super. Ct. 1995)). *See also Philadelphia Elec. Co. v. James Julian, Inc.*, 425 Pa. 217, 220 (1967) (expressly adopting §417 and §427 of the Restatement (Second) of Torts, which define the peculiar risk doctrine). The Supreme Court of Pennsylvania, in further construing the peculiar risk doctrine, has "held that so long as the employer exercises reasonable care in selecting a competent contractor, liability for failing to take precautions [against a given risk] will not attach." *Farabaugh*, 590 Pa. at 67 (citing *Breletich v. U.S. Steel Corp.*, 445 Pa. 525, 433 (1971)). Moreover, since "the peculiar risk [and] special danger

---

[3] Figured appears to concur with Carrizo in this regard. In his brief in opposition to the instant motion, Figured states, "[t]he [p]eculiar [r]isk [d]octrine clearly does not apply to . . . Figured's fall." (Doc. 31).

doctrines are exceptions to the general rule, they should be viewed narrowly." *Emery*, 725 A.2d at 814 (citing *Edwards v. Franklin & Marshall College*, 663 A.2d 187, 190 (Pa. Super. Ct. 1995)).

In the instant action, the applicability of the exception for peculiar risks fails at the second prong of the two-part test. *See id.* at 814. As a preliminary matter, the risk at issue here is the risk that a worker at the Shaskas Well Pad might step into water pooled in the containment area and subsequently fall off a ladder while descending it. On the first prong of the two-part test, such a risk certainly would have been foreseeable to a reasonable landowner at the time when the contract was entered into. *See id.* The very nature of the contracted-for job involved transporting water by operating various transport hoses and release valves located on and around the holding tanks. (Doc. 26-2). Further, Figured testified that, before filling up a given holding tank, he always had to climb up a ladder to see into the holding tank and determine whether it could hold any additional water. (*Id.*). The containment area itself was specifically designed to collect any excess water that happened to leak from the hose or spill from the holding tanks. (*Id.*). Thus, the notion that water pooled in the containment area may have gotten onto a worker's boots and facilitated a slip-and-fall accident was foreseeable by a reasonable person.

The second prong of the two-part test asks whether the risk was "different from the usual and ordinary risk[s] associated with the general type of work done." *Emery*, 725 A.2d at 814. Here, it was not. Figured testified repeatedly that his occupation encompassed numerous risks and safety concerns, adding that he routinely encountered such risks throughout his experience in the industry. (Doc. 26-2). Specifically, Figured noted that he had previously stepped into water that was pooled in the containment areas around the holding tanks during his work assignments. (*Id.*). As such, the specific risk at issue in this case was well within the realm of risks that were to be expected when performing this type of work. Finally, it is clear that Carrizo, the employer, selected a competent contractor for the job. Rural, Holcombe, and Figured himself each possessed years of experience with successfully performing water hauling services. (*Id.*). To seasoned professionals like these, the idea that a containment area on a fracking site might cause injuries was far from peculiar. As such, the risk of Figured's injuries occurring was not a peculiar risk, and Carrizo cannot be held liable for said injuries on this basis.

**C. Landowners' Duties to Business Invitees**

The primary argument of the plaintiff, Figured, in opposing summary judgment on the issue of liability is that the defendant, Carrizo, breached its common law duty of care that is owed as a landowner to business invitees,

such as the employees of independent contractors. (Doc. 31). The Supreme Court of Pennsylvania has held that, "[i]n cases where a possessor of land employs an independent contractor . . . [the] possessor of land must use reasonable care to make the premises safe or give adequate and timely warning of dangers known to him but unknown to the contractor or his employees." *Farabaugh*, 590 Pa. at 61 (2006) (quoting *Crane v. I.T.E. Circuit Breaker Co.*, 443 Pa. 442, 445 (1971)). "However, the possessor of the land can insulate himself from liability by warning the contractor of the existence of any dangerous conditions on the premises [that] he knows or should know [about], and [the landowner] need not warn the contractor's employees [of such dangers]." *Id.* "Thus, a property owner has no duty to warn the contractor or its employees of conditions that are at least as obvious to the contractor and its employees as they are to the landowner." *Beil*, 608 Pa. at 279. Notably, the Supreme Court of Pennsylvania has found in favor of landowners in situations where both the landowner and the contractor had roughly equal knowledge of the relevant danger or risk. *See, e.g.*, *Farabaugh*, 590 Pa. at 61.

On the facts of this case, it is undisputed that Figured was fully aware of the potential dangers associated with his job as a water hauler, including both the potential for the containment area surrounding the holding tanks to become flooded with water and the possibility of needing to step into and

- 15 -

around the containment area to link up the transport hose. (Doc. 26-2). Figured testified that he knew about the hazards at stake when he reported to work and that he had stepped into water in the containment area before. (*Id.*). Figured also worked in the oil and gas industry as a water hauler for several other companies beginning in 2011, and during that time, he received both formal and informal training on the proper methodologies for transporting water. (*Id.*).

Since the risk of water pooling in the containment area was obvious, Carrizo had no specific duty to warn Figured about it. The containment area that flooded with water was large and visible to all who came into contact with it, especially those who worked at the Shaskas Well Pad on a regular basis. (*Id.*). Furthermore, the containment area was built precisely for the specific purpose of collecting excess water that happened to leak from the hose or from the holding tanks. (*Id.*). In fact, part of Figured's job, on occasion, was to vacuum the excess water out of the containment area to remove it from the premises. (*Id.*). The duty to warn is only triggered in this context when a risk is "known to [the landowner] but unknown to the contractor or his employees." *Farabaugh*, 590 Pa. at 61. Figured, by contrast, was very familiar with the containment area, how it functioned, and the proper protocols for dealing with it. (Doc. 26-2). Thus, Carrizo owed no duty to warn Figured or his employer

about a condition on the land that was just as apparent to the injured party as it was to the landowner itself. *Beil*, 608 Pa. at 279.

Figured cites to cases such as *Carrender v. Fitterer*, 503 Pa. 178, 185 (1983); *Argo v. Goodstein*, 438 Pa. 468, 476-77 (1970); *Stebner v. Young Men's Christian Ass'n*, 428 Pa. 370, 376 (1968); and *Regelski v. F. W. Woolworth Co. of Pa.*, 423 Pa. 524, 526 (1967), to support the proposition that Carrizo breached its duty to Figured by failing to maintain the premises at the Shaskas Well Pad in a reasonably safe condition. His reliance on these cases, however, is misplaced, as the Shaskas Well Pad is not a place of business that is "open to the public." *Regelski*, 423 Pa. at 526. In each of Figured's cited cases, the plaintiff was injured on premises that were easily accessible to the general public. *See Carrender*, 503 Pa. at 181 (where the plaintiff slipped and fell on a patch of ice in a public parking lot); *Argo*, 438 Pa. at 471 (where the blind plaintiff fell through an area of a public business without a floor into the basement below); *Stebner*, 428 Pa. at 371 (where the plaintiff was trapped in a steam room at the YMCA, banged on the glass door for assistance, and shattered the glass, injuring himself); *id.* at 525-26 (where the plaintiff was struck from behind by a swinging doorway in a public business setting).

Here, the plot of land in question was used primarily for excavating fossil fuels from underground. (Doc. 26-2). Owned premises of this nature are not

typically open to the general public, and indeed, Figured testified that the entrance to the Shaskas Well Pad was usually either guarded by Carrizo security personnel or chained shut with a padlock. (*Id.*). He further testified that the premises were chained shut on the evening of his injury. (*Id.*).

"An owner of land who delivers temporary possession of a portion of the land to an independent contractor owes no duty of care to the employees of the independent contractor with respect to an obviously dangerous condition on that portion of the land in the possession of the contractor." *Farabaugh*, 590 Pa. at 64 (citing *Hader v. Coplay Cement Manufacturing Co.*, 410 Pa. 139, 151 (1971)). As such, Carrizo cannot be held liable based upon a failure to maintain its premises or upon a failure to warn Figured of a non-obvious risk. Accordingly, the court will grant Carrizo's motion for summary judgment.

IV. **CONCLUSION**

For the foregoing reasons, the defendant's motion for summary judgment will be **GRANTED**. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: December 8, 2017**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-1340-01.docx